Earl **PANIOR** and **William M. Johnson,** on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

v.

The **IBERVILLE PARISH SCHOOL BOARD** et al., etc., Defendants-Appellees.

No. 73-2797.

United States Court of Appeals, Fifth Circuit.

July 22, 1974.

Rehearing Denied Aug. 13, 1974.

George M. Strickler, Jr., New Orleans, La., for plaintiffs-appellants.

William J. Guste, Jr., Atty. Gen., Kenneth C. DeJean, 1st Asst. Atty. Gen., Baton Rouge, La., Samuel C. Cashio, Dist. Atty., 18th Judicial Dist., Maringouin, La., Joseph W. Cole, Jr., Port Allen, La., for defendants-appellees.

Before BROWN, Chief Judge, and RIVES and DYER, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The District Court approved a reapportionment plan for electing members to the Iberville Parish School Board (Board). The plan's operation results in (i) two districts being over-represented by over 21%, two under-represented by over 15%—a total deviation of 37.-45%, and (ii) several incumbents (elected under the previous, concededly malapportioned ward system) being automatically continued in office. Appellants, self described as a class of under-represented black residents of Iberville Parish, claim the new plan violates their federal constitutional rights to fair representation. We agree.

The Board first complains appellants should have pursued a remedy in the Louisiana courts, under the state reapportionment statute. (See note 1, *infra*). But that ignores the function of the Fourteenth Amendment which secures the equal protection of minorities' rights from the inequalities imposed upon them by state laws. In particular, this includes not only every citizen's right to vote, but the right to have that vote count as much as any other voter's. Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

The Board, presumably responding to the laudable recent statute[1] requiring equality in Louisiana School Board elections, adopted the challenged 15-district representation plan to replace an earlier state legislatively imposed 9-ward system which had disparities running as high as 48% under and 42% over representation. In contrast to the previous ward plan, the new districts are claimed to have been designed to conform to the four elementary-to-high school sub-systems existing in four "communities-of-interest", (i) Maringouin, Rosedale, and Grosse Tete, (ii) Metropolitan Plaquemine, (iii) White Castle, and (iv) a two-district area on the "other" (East[2]) side of the Mississippi River.

■ At the outset there is the question of whether the governmental responsibilities and operations of the Parish School Board call for the one-man-one-vote standard. On argument the Court called for additional briefs. We are of the clear view that the principle applies. Under Louisiana law the Board has the power to determine the number of schools to be operated by the parish and their location, to employ and discharge all employees of the school system including teachers and principals, to fix salaries of all employees, to purchase property and equipment and to construct schools, to lease and sell school system property, and to assign students to the various schools. See, La.R.S. 17:81–17:87, 17:104, 17:443.[3]

These responsibilities and activities are the substantial equivalent of the governmental operations declared to be

---

1. The statute as amended in 1970 provides: "Each of the parish and city school boards, as heretofore created and organized, is hereby authorized to reapportion itself so that each member of said board represents as nearly as possible the same number of persons. Such reapportionment shall be based upon the 1970 federal census, or a special census as authorized hereinafter, and shall be accomplished and become effective when a school board has complied with the provisions of R.S. 17:71.4." LSA–R.S. 17:71.1.

2. At places along the Mississippi in Iberville Parish, the East Bank is really not the East Side of the River. In Louisiana the right ascending bank is always the East Bank.

3. "General powers of board
   "Each parish school board shall determine the number of schools to be opened, the location of the school houses, the number of teachers to be employed, and select such teachers from nominations made by the parish superintendent, provided that a majority of the full membership of the board may elect teachers without the endorsement of the superintendent. The boards shall have authority to employ teachers by the month or by the year, and to fix their salaries; provided that there shall be no discrimination as to sex in the fixing thereof and provided further, that it is not the purpose of this Section to require or direct the reduction of any salary, or salary schedule, presently in force. The boards shall see that the provisions of the state school laws are complied with.

   "Each school board is authorized to make such rules and regulations for its own government, not inconsistent with law or with the regulations of the Louisiana State Board of Education, as it may deem proper.

   *     *     *     *     *

   "Each school board shall exercise proper vigilance in securing for the schools of the parish all funds destined for the support of the schools, including the state funds apportioned thereto, and all other funds.

   *     *     *     *     *

   "Parish school boards may receive land by purchase or donation for the purpose of erecting school houses; provide for and secure the erection of same, construct such outbuildings and enclosures as shall be conducive to the protection of property, and make repairs and provide for the necessary furniture, equipment and apparatus. All contracts for new buildings, and improvements costing more than one thousand dollars, shall be let to the lowest bidder, the board reserving the right to reject any and all bids.

   "They have the power to recover for any damage that may be done to the property in their charge; they may change the location of a school house, sell or dispose of the old site, or of any site which for any reason can no longer be used or which is unused and unnecessary or unsuitable as such, and use the proceeds thereof for procuring a new one.

   *     *     *     *     *

   LSA–R.S. 17:81.

adequate in Hadley v. Junior College District, 1970, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45.[4]

Relying on *Hadley,* federal courts have consistently held elected state boards of education and local school boards bound by the "one person, one vote" standard. Powers v. Maine School Administration District, No. 1, D.Me., 1973, 359 F.Supp. 30 (district board); LoFrisco v. Schaffer, D.Conn., 1972, 341 F.Supp. 743 (local board), summarily aff'd, 1972, 409 U.S. 972, 93 S.Ct. 313, 34 L.Ed.2d 236; Leopold v. Young, D. Vt., 1972, 340 F.Supp. 1014 (district board); Dameron v. Tangipahoa Parish Police Jury, E.D.La., 1970, 315 F.Supp. 137 (Parish school board); Fahey v. Lexalt, D.Nev., 1970, 313 F.Supp. 417 (state board). *See also,* Dundee v. Orleans Parish Board of Supervisors of Elections et al., 5 Cir., 1970, 434 F.2d 135. And we do not regard subsequent Supreme Court cases dealing with specialized situations as significantly undermining *Hadley* or its holding.[5]

■■ When it comes to the merits the Board wholly failed to supply a record justification for the 37.45% deviation from numerical equality among the 15 new districts.[6] And in assaying the initial arithmetical achievement of the ideal the deviation is the total of the extreme over-representation and the extreme under-representation (see Dist. A and B as under-represented and Dist. I and J as over-represented. App., *infra*). Indeed, this seems to have been the source of the trial Judge's misjudgment on the extent of the disparity and hence the need for corrective action. For in a

number of ways he was positive that the deviation began with zero either up or down, but not both. But in this world of constitutional numbers the test lays the voting strengh of the most disadvantaged voter against that of the most overprivileged. Mahan v. Howell, 1973, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320; Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399.

■ The principal factor urged by the Board is the existence of the four so-called communities of interest. Complicating, but a part of that, is the geographical separation of the area on the East Bank of the River. We do not doubt that, as in many essentially rural parishes throughout the state or in counties throughout the land, there are here the four pretty well definable groupings, clusters of people, with the natural commercial and social activities flowing from these concentrations. But these facts do not justify the marked deviation in the election of this body.

There is first the fact of history. In the thirty some years in which the highly disparate 9-ward plan was in effect the school system operated without any indicated difficulty through a 9-man Board elected from ward lines bearing no conscious relationship to the four communities of interest.

When it came time to reapportion as the 1970 law required, the Board acted commendably in seeking the assistance of the staff of the Louisiana School Board Association and the Public Affairs Research Council (PAR). Eleven plans were submitted by PAR and the 15-man plan adopted was substantially a

4. "[T]he trustees can levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college. . . ." 397 U.S. at 53, 90 S.Ct. at 794, 25 L.Ed.2d at 49.

5. For example, a state judicial elections need not be conducted in a one-man one-vote manner, Wells v. Edwards, 1973, 409 U.S.

1095, 93 S.Ct. 904, 34 L.Ed.2d 679. Bodies whose only responsibilities are for planning and administering local water use may have their electorate limited to landowners. Further, those votes may be weighted according to acreage or assessed property value. Associated Enterprises, Inc. v. Toltec Watershed Improvement District, 1973, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675; Salyer Land Co. v. Tulare Water District, 1973, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659.

6. See Appendix, page 1237 post, showing details by Districts.

joint product of the Board and PAR. But in laying down guideline criteria to PAR for development of a plan other than those eleven, the Board representatives stressed finding lines which would best assure reelection of the incumbents.[7] And considering that PAR was sought out for its familiarity with the problem of reapportionment of Louisiana governmental units and thereby had a non-legal working knowledge of Supreme Court cases on factors and percentages, it is significant that its Director of Research (see note 7, *supra*) stated that PAR would not have recommended the 15-man plan adopted.

And all these possible subjective motivations aside, the most important thing is the statutory structure of the Board, its duties and responsibilities. (See note 3, *supra*). The Board acts as a unit. The Board as a whole has the responsibility for operating *all* of the schools. The Board's function and responsibility is not decentralized into the four segments. Granted that it is both understandable and permissible that election lines may be drawn to take into account centers of interest, this cannot justify deviations approaching those here for election to an operative body which has to act as a unit. Not only must it act as a unit, its actions may have parish-wide consequence on voters.

Each voter is, therefore, entitled, so far as practicable, to an equal voice in

the ultimate responsibility for such actions whether the brick and mortar are to go to the East Bank or to Metropolitan Plaquemine. Whether any set of conceivable circumstances could justify a situation such as this where two voters in two districts all but equal three voters in two others, we simply hold this case falls far short of that mark. The Supreme Court has approved a 16.4% maximum deviation, Mahan v. Howell, 1973, 410 U.S. 315, 93 S.Ct. 979, 35 L. Ed.2d 320, but it is unlikely to approve a much higher variation—certainly not one more than twice as great. And none of the local factors stressed here measure up either in historical traditions or impossibility of solution to those which led the Court to approve tolerances it would otherwise have struck down in *Mahan* or in Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399.

To cap it all off, the 15-man plan, conceived at least in part with a friendly eye toward incumbents (see note 7, *supra*) did not leave that to chance or voters' wishes or whims. With respect to those members serving at the time of its adoption the plan itself called for them to complete the terms for which they had been elected under the 9-man ward system with its built-in disparity of 100% (48%+ and 42%−). Thus, out of a 15-man Board 7 were elected by wards by allocation to Districts which do not at all correspond to the wards from which elected.[8]

---

7. The Director of Research, called by the Board as a witness, testified:

   Q. Now, did your organization assist in the preparation of the fifteen member plan?

   A. Well, we did assist,

   \*     \*     \*     \*     \*

   They asked, for example, can you draw up a plan which will use this type hypothet \* \* \* "Can you draw up a plan with fifteen members and be sure that all incumbents have a seat from which to be re-elected and takes into consideration certain geographic factors. \* \* \* "

   And this is what was involved in this fifteen member plan, some of these factors.

8. At the present time, 6 Board members elected under the old ward plan still "represent" certain of the new districts. They will be up for reelection on a staggered basis, 3 in 1974, 3 in 1976.

   The factual accuracy of the following from appellants' brief is unchallenged:

   Neal Malloy who was elected from old Ward 9 will represent district "A" which is approximately half the size of Ward 9. He will serve until 1976. Joseph Distefano was elected from old Ward 6 and has been assigned district "C", an area approximately one-fourth the size of Ward 6. He will serve until 1976. L. C. Dupont and Carlysle Marix originally elected from Ward 2 have been assigned district "E", a mere fraction of the old Ward 2. They will serve until 1976. Walter Marionneaux was elected from

■ Obviously the continuation in office of those elected under an admittedly unconstitutional system and in no real sense ever "elected", i. e., chosen by voters on the more palatable but still unacceptable plan cannot square with one-man one-vote. With respect to these hold-over-carry-over pre-1972 incumbents these terms should end at the earliest—the word is earliest—possible time. The upshot of this is that we must remand to the District Court with directions to enter appropriate orders. These will include (i) enjoining election (primaries or general) of any Board members under the 15-man plan, (ii) requiring the termination at the earliest possible time of the terms of those who are serving thereunder (or pre-1972 carry-over incumbents [9]), (iii) requiring the Board to submit an acceptable plan or plans without delay, (iv) requiring further hearings and determinations on an expedited priority basis, (v) the entry of such other orders as are desirable or appropriate in connection with the electoral process to assure the opportunity for voters to vote in 1974 for Board members under a constitutional plan, and (vi) award of attorney's fees including allowance for services in the Court of Appeals. The mandate shall issue forthwith.

Reversed and remanded.

## ON PETITION FOR REHEARING ORDER

■■ The Petition for Rehearing is denied. But the Court does wish to make clear that it did not mean to require earlier action with respect to pre-1972 carry-over members than was allowable as to those elected under the 1972 plan. The "earliest possible time" need not be "immediate" and may be considered by the District Judge to be the same for each in order to continue the body in existence pending adoption of a new constitutional plan. The Court meant only that members elected under an impermissible plan may not be carried over (without re-election) into a new plan, regardless of the new plan's acceptability, simply to provide "continuity".

APPENDIX

IBERVILLE PARISH SCHOOL BOARD ELECTION DISTRICTS

IN EFFECT AFTER MAY 1, 1973

| DISTRICT | BOARD MEMBERS PER ELECTION DISTRICT | POPULATION OF ELECTION DISTRICT* | POPULATION PER BOARD MEMBER | IDEAL POPULATION PER BOARD MEMBER | PERCENTAGE DEVIATION FROM IDEAL |
|---|---|---|---|---|---|
| A | 1 | 2,366 | 2,366 | 2,050 | +15.36% |
| B | 1 | 2,367 | 2,367 | 2,050 | +15.36% |
| C | 1 | 2,096 | 2,096 | 2,050 | +2.24% |
| D | 1 | 1,797 | 1,797 | 2,050 | −12.34% |
| E | 2 | 4,183 | 2,091 | 2,050 | +2.00% |
| F | 1 | 2,026 | 2,026 | 2,050 | −1.17% |
| G | 1 | 2,216 | 2,216 | 2,050 | +8.09% |
| H | 1 | 2,146 | 2,146 | 2,050 | +4.68% |
| I | 1 | 1,597 | 1,597 | 2,050 | −22.09% |
| J | 1 | 1,618 | 1,618 | 2,050 | −21.07% |
| K | 2 | 4,171 | 2,035 | 2,050 | −0.73% |
| L | 2 | 4,193 | 2,096 | 2,050 | +2.24% |

* Iberville Parish School Board Statistics incorporated in resolution of February 8, 1972 adopting new plan R. 58, 60–61.

Ward 8 and he has been assigned district "L" which includes not only all of Ward 8 but also the large majority of old Ward 6. He will serve until 1974. (One of the incumbents to have been elected in 1976 is now deceased.)

9. No Toney v. White, 5 Cir., 1973, 488 F.2d 310 (en banc), problem exists as this suit was filed in January 1972 attacking the old 9-man system and by subsequent proceedings the new 15-man plan and the election then to be held under it.