Cassius C. FERGUSON a/k/a C. C. Ferguson, Plaintiff-Appellant.

v.

WINN PARISH POLICE JURY and Winn Parish School Board et al., Defendants-Appellees,

v.

Elijah MALLORY, Intervenor-Appellant,

United States of America, Intervenor.

No. 74–3408.

United States Court of Appeals, Fifth Circuit.

March 10, 1976.

Bobby L. Culpepper, Wm. H. Baker, Donald C. Brown, Jonesboro, La., for Ferguson & Mallory.

Charles B. Bice, Dist. Atty., 8th Jud. Dist., Kermit M. Simmons, Asst. Dist.

Atty., W. Scott Maxwell, Winnfield, La., for defendants-appellees.

Gerald W. Jones, Chief, Voting & Public Accommodations, U. S. Dept. of Justice, Washington, D. C., for the United States.

Before THORNBERRY, SIMPSON and MORGAN, Circuit Judges.

MORGAN, Circuit Judge:

Plaintiff appeals from a district court approved plan of reapportionment for the Winn Parish School Board and Winn Parish Police Jury. Plaintiff argues that the apportionment of the School Board violates the "one man-one vote" maxim of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and progeny in that the total variation between the highest represented and lowest represented district is 37.71%. Plaintiff also contends that the apportionment plan of the Police Jury, which utilizes both single and multi-member districts, results in a dilution of black votes in violation of the Fifteenth Amendment. In addition, plaintiff argues that the award of $500 attorney's fees was excessively low.

## I. School Board

■ Plaintiff below, attacked a 1970 court ordered apportionment of the School Board.[1] That plan called for five election districts, with District 1 electing five at-large members, District 2 electing two at-large members with no more than one member from any one of the three wards constituting District 2, and Districts 3, 4, and 5 electing one member each for a total school board membership of ten persons. The district court, below, held that this 1970 plan did not offend Fourteenth Amendment "one man-one vote" requirements, but did violate the Fifteenth Amendment in its apportionment of District 1 into a five-person, multi-member district. Accordingly,

the court approved a plan adopted by the school board that called for ten election districts, with District 1 divided into five single-member districts, with three other single-member districts, and with two voting districts combined to elect two members at-large.[2]

Plaintiff argues that the population variation of 37.71% between the most over-represented and the most under-represented district is too great to withstand constitutional scrutiny. We agree. While mathematical exactitude is not required in state and local reapportionment plans, *Reynolds v. Sims, supra,* and while small variations from the ideal are insufficient to establish invidious discrimination, *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), a deviation of 37.71% is certainly beyond the *de minimus* range. In *Swann v. Adams,* 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), the Supreme Court reversed a Florida legislative reapportionment plan that provided for a total variation from the ideal of 25% in the state senate and of 33% in the state house, basing its reversal on failure of the state or of the district court to articulate acceptable reasons for these substantial variations. *Id.* at 443–44, 87 S.Ct. 569. Likewise, in *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the Court reversed a plan allowing total variations of 28% and 25% in each house of the Indiana legislature. Finally, in *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771, *reh. den.,* 386 U.S. 999, 87 S.Ct. 1300, 18 L.Ed.2d 352 (1967), the Court disapproved a 26% variation, noting that it was unsure that any policy considerations could justify such variations, although it did not have to reach that question since the plan did not achieve announced policy objectives.

■ In the present case, the district court did not articulate any reasons for allowing such a large variation among voting districts. The defendants now argue that such deviations are required to

1. See Appendix I.

2. *Id.*

achieve their objective of restricting school board election districts to traditional school attendance zones; that is, only voters within high school district 1 would vote for a school board member in the corresponding election district. Besides the fact that the approved plan does not even achieve this goal,[3] we have recently held that such an objective cannot justify these significant variations. *Panior v. Iberville Parish School Board,* 498 F.2d 1232 (5th Cir. 1974). In *Panior,* the district court had approved a plan that created four school board election districts to conform to four high school sub-systems and that resulted in a 37.45% total variation among school board election districts. In reversing, we held:

> The Board acts as a unit. The Board as a whole has the responsibility for operating all of the schools. The Board's function and responsibility is not decentralized into the four segments. *Granted that it is both understandable and permissible that election lines may be drawn to take into account centers of interest, this cannot justify deviations approaching those here for an election to an operative body which has to act as a unit.* . .
>
> Each voter is, therefore, entitled, so far as practicable, to an equal voice in the ultimate responsibility for such action whether the brick and mortar are to go to East Bank or to Metropolitan Plaquemine. Whether any set of conceivable circumstances could justify a situation such as this where two voters in two districts all but equal three voters in two others, we simply hold this case falls far short of that mark. *Id.* at 1236. (Emphasis added.)

Accordingly, we reverse and remand that portion of the judgment setting up school board election districts and direct the district court to establish or approve a plan resulting in acceptable total variations in population among school board districts.

## II. *Police Jury*

■ In the 1970 apportionment plan, the Police Jury was divided into two voting districts—districts A and B—with six representatives allotted to each district for a total Police Jury membership of twelve.[4] The district court, below, holding that the apportionment of Ward A into a six multi-member district offended the requirements of the Fifteenth Amendment, adopted a plan proposed by the Police Jury that called for a ten member Police Jury with District A divided into five single-member districts (election districts one–five) and with District B maintained as a five person multi-member district (election districts six–ten).[5] Plaintiffs challenge the retention of this "at-large" system of representation in Districts Six–Ten on Fifteenth Amendment grounds.[6]

■ It is difficult for us to determine from plaintiff's brief, whether plaintiff argues that multi-member districts are per se unconstitutional or argues that the maintenance of District B (6–10) as a multi-member district unconstitutionally dilutes black votes. Certainly, multi-member election districts are not per se unconstitutional. *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). In analyzing the constitutionality of the use of such a scheme in the present case, we are cognizant that the Supreme Court has classified cases involving multi-member districts into two groups, with the classification dependent on whether the multi-member election plan originated solely

---

**3.** School Board Election District 7/8 includes two school attendance zones in contravention of the Board's objective of limiting the boundaries of each election district to those of *one* school attendance zone.

**4.** See Appendix II.

**5.** *Id.*

**6.** The population variations between voting districts—6.05%—is *de minimus* and acceptable on Fourteenth Amendment grounds, under the guidelines laid down by *Gaffney, supra.*

from the court or from a legislative body. In *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), the Court held:

"[W]hen district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." [*Connor v. Johnson*, 402 U.S.] at 690, [91 S.Ct. 1760] 29 L.Ed.2d 268. . . .

The standards for evaluating the use of multimember districts thus clearly differ depending on whether a federal court or state legislature has initiated the use . . .

Appellants do not contend that any racial or political group has been discriminated against by the multimember districting order by the District Court. They only suggest that the District Court has not followed our mandate in *Connor v. Johnson*, and that the court has failed to articulate any reasons for this departure. We agree. Absent particularly pressing features calling for multimember districts, a United States district court should refrain from imposing them upon a State. *Id.* 95 S.Ct. at 761, 42 L.Ed.2d at 779–80.

■ Therefore, if this case were governed by *Chapman*, we would remand it back for failure of this district court to articulate compelling reasons for use of a multi-member plan. Consistent with our holding in *Wallace v. House*, 515 F.2d 619 (5th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3399 (U.S. Dec. 26, 1975) (No. 75–914), however, we do not believe the present case to be governed by *Chapman*, and, accordingly, we do not base our remand on the district court's failure to articulate justifications for its plan. In *Wallace*, we held that when a

district court, in invalidating an all at-large aldermanic election plan, is forced to formulate a new apportionment plan, it can properly choose the local legislative body's proposed plan, utilizing some multi-member representation, rather than adopt a total single district plan, as long as that body's plan is constitutional. *Id.* at 635–36. Interpreting the Supreme Court's determinations in *Connor* and *Chapman* to be based on its supervisory powers over federal courts, as opposed to constitutional considerations, we distinguished these cases on the basis of the unusual facts operative in each of them: in *Connor*, the parties in the litigation had proposed plans utilizing single-member districts exclusively, but the district court, in its order reapportioning the Mississippi Legislature, had employed some multi-member districts; in *Chapman*, the use of multi-member districts had originated solely from the district court and had never been proposed or sanctioned by the North Dakota legislature. Noting that in *Wallace*, unlike in the two Supreme Court cases, the impetus for a multi-member plan was derived from the governmental body in question, we held that "because of the complex political judgments involved in reapportionment plans," courts could and should defer to legislative preferences when these preferences can result in constitutional plans.[7] *Id.* at 636. Accordingly, since the local governmental body, and not the court, originated the multi-member plan in the present case and since there is some statutory history supporting such a plan,[8] the district court did not contravene the mandate of *Chapman* in its adoption, without a showing of compelling justifications, of the Police Jury's multi-member plan. The constitutionality of the present multi-district plan must still, however, be determined.

7. We rejected plaintiff's contention that *Chapman* drew a distinction between apportionment plans already in operation and proposed schemes advanced by legislators for adoption only in the event the existing scheme is found to be unconstitutional, noting that the nature of the legislative plan—either operational or prospective—does not determine whether a court may defer to it. *Wallace v. House*, 515 F.2d 619, 635–36 (5th Cir. 1975).

8. Until 1968, Louisiana law prohibited at-large elections for School Boards and Police Juries (the law required at least five wards from which the members of these bodies were to be elected). By Louisiana Acts of 1968 No. 445 Section 1 (amending La.R.S. 33:1221) and No. 561 (adding La.R.S. 17:71.1–17:71.6), Louisiana Law was amended to allow at-large elections (or elections from less than five wards) for School Boards and Police Juries.

The Supreme Court has held that before a multi-member plan can be invalidated on constitutional grounds, it must be shown that "designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." *Fortson v. Dorsey*, 379 U.S. at 439, 85 S.Ct. at 501. Emphasizing that those invidious qualities which often characterize multi-member districts must be affirmatively demonstrated in the particular plan before it will be invalidated, the Court later stated:

> We are not ready, however, to agree that multi-member districts, wherever they exist, overrepresent their voters as compared with voters in single-member districts, even if the multi-member delegation tends to bloc voting. The theory that plural representation itself unduly enhances a district's power and the influence of its vote remains to be demonstrated in practice and in the day-to-day operation of the legislature. *Whitcomb v. Chavis*, 403 U.S. 124 at 147, 91 S.Ct. 1858 at 1871, 29 L.Ed.2d 363.

Clearly, then, the burden of proving invidious discrimination through use of a multi-member system of districting is on the person challenging that plan.

■ Under the present plan, there are two possible ways in which dilution of political or racial elements could occur. First, one could argue that voters in District B (6–10) are benefited by the opportunity to elect their jury members in an at-large system, while those in District A (1–5) elect only a single member per district. According to this argument, each voter in District B votes for five police jury members; each voter in Ward A, divided into five districts, can vote for only one member. Therefore, with a total parish population of 16,360 —8,389 in Ward A and 7,971 in Ward B—it is conceivable that a given 4,000 voters in Ward B, over 50% of that Ward's population but only 25% of the total parish population, could elect five members or 50% of the police jury. Each of those 4,000 voters in Ward B would thereby enjoy the voting power to elect five jury members, while each of the voters in Ward A would have the power to elect only one member. Such an argument is extremely speculative; indeed, plaintiff does not advance it here. Accordingly, while we believe that the combined single and multi-member system is extremely bizarre in the present case and seems to satisfy no particular state policy in favor of multi-member districts, the fact that it is an illogical plan is not enough in itself to invalidate it. *See, White v. Register*, 412 U.S. 755 at 762, n.6, 93 S.Ct. 2332 at 2337, 37 L.Ed.2d 314 at 322 (1973) (fact that the use of single and multi-member districts might have constituted "irrational mixture" does not mean that the mere mixture of single and multi-member districts in a single plan, even among urban areas, is invidiously discriminatory). *Kilgarlin v. Hill*, 386 U.S. 120 at 121, 87 S.Ct. 820, 17 L.Ed.2d 771 (allegation that utilization of single-member, multi-member, and floterial districts constituted a *"crazy* quilt" did not prove racial or political gerrymander in violation of Fourteenth Amendment). Rather, if plaintiff wishes to attack the mixed single and multi-member districts, upon remand, on the basis of the above argument, he has the burden of proving that this scheme invidiously discriminates against identifiable racial or political elements.

■ A second possibility for dilution, under a Fifteenth Amendment theory,

On April 29, 1969, Acts 445 and 561 were submitted to the Attorney General of the United States pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. On June 26, 1969, both Acts were rejected as having "the effect of discrimination against Negro voters on account of their race, and of denying to them an effective voice in the selection of Police Jury and School Board members." On September 10, 1969 this rejection was reaffirmed by the Attorney General of the United States.

exists within District B itself. The district court reapportioned District A into five districts (Districts 1–5) because of Fifteenth Amendment considerations. From our examination of the briefs and statistics, we presume the court to have reasoned that blacks, who constituted 40.27% of District A, should have enjoyed the power to elect at least one of that Ward's police jury members, but that because of the multi-member method of election, these black votes were diluted.[9] Accordingly, the court divided A into five single-member districts that yielded one certain[10] and one possible[11] black seat. Likewise, there has been no black representation on the police jury from District B, a multi-member system under both the 1970 and 1974 plan. While District B contains only 19.3% black population, as opposed to the 40.27% figure for blacks in District A, it is still possible that a fairly drawn single-member plan, in B, as well as in A, could result in a greater and fairer role for black voters in police jury elections.

We cannot determine from the record whether the establishment of a single-member district in District B, as well as in District A, is necessary to avoid a dilution of black votes, in violation of the Fifteenth Amendment. We have examined the breakdown of residents in the School Board's districts 6–10—the Board equivalent of Police Jury District B. In these districts, the percentage of blacks in each district ranges from only 7% in District 6 to 39% in District 10.[12] Therefore, one could argue that dividing District B into single-member districts would not significantly increase black participation in the jury election process, since it is doubtful that even 39%, much less 7%, of a district could "control" an election in that particular district. Yet, these population figures in Districts 6–10, showing a small percentage of blacks in each single-member district, are not dispositive in that we have already held that the substantial population variations among school districts violate the Fourteenth Amendment. In addition, the greatest variation between school board districts occurs between District 7/8, with 20% overrepresentation, and District 10, with 18% underrepresentation—both of which are located in District B. Accordingly, School Board Districts 6–10 are severely malapportioned and must be redistricted before we can determine whether a similar single-member scheme for police jury elections is necessary to avoid dilution of black votes.

From our examination of the maps in the record, we also note that School Board District 10, with a 39% black population, is adjacent to District 9 (19% black population) and District 5 (27% black population). When the district court redraws the school board lines, it is possible that the black population may be significant enough in one or more districts to compel total single-member districting for police jury elections.

Accordingly, we remand the apportionment plan for the police jury to the district court in order that it might redraw school board single-member districts, and might then compare, for the purpose of adopting a plan for police jury elections, the impact on black voters of a *properly* apportioned single-member district system with that of a multi-member plan.

In addition to raw population data, the district court should examine those other factors that have been established to aid courts in their analysis of multi-member plans. In *Zimmer v. McKeithen*, 485 F.2d 1297 (1973), we noted some of those considerations when we held:

[W]here a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of

---

**9.** Testimony revealed that no black had ever been elected to the police jury.

**10.** Election District 1, with a 100% black population.

**11.** Election District 3, with a 45% black population.

**12.** See Appendix I.

legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of a past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. [Footnotes omitted.] *Id.* at 1305.

We note that many of the factors that tend to invalidate multi-member schemes —a majority vote requirement, an anti-single shot voting provision, and the absence of a requirement that at-large candidates run from a specified geographic area—exist here and we direct the court to carefully weigh their effect before it imposes any multi-member plan for the police jury.

### III. *Attorney's Fees*

 Plaintiff argues that the district court's award of $500.00 in attorney's fees was unduly low. While we agree that the trial court acted properly in awarding some attorney's fees,[13] we disagree that the amount awarded was erroneous. This court has consistently held that the determination of a reasonable attorney's fee is left to the sound discretion of the trial judge and is not to be set aside absent a clear abuse of that discretion. *E. g., Ranger Ins. Co. v. Algie,* 482 F.2d 861 (5 Cir. 1973); *Weeks v. So. Bell Tel. & Tel. Co.,* 467 F.2d 95 (5th Cir. 1972); *Electronics Capitol Corp. v. Sheperd,* 439 F.2d 692 (5th Cir. 1971). Plaintiff does not set out any particular reasons to justify his argument that the trial court's award constituted an abuse of discretion. He merely cites two election cases in which attorneys received a higher award for his proposition that the present award was too low. After examination of the record in the present case, we cannot say that the trial court's award constituted a clear abuse of discretion.

Affirmed in part—reversed in part.

Appendix to follow.

---

**13.** In *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court held that the private attorney general rule cannot support the award of attorney's fees in federal cases, in the absence of a statutory mandate. At the initiation of this case in district court, there was no statutory authority for the award of attorney's fees. Since that time, however, Congress has amended the Voting Rights Act by permitting a court, in its discretion, to award attorney's fees to the prevailing party in any action or proceeding to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. 42 U.S.C. § 1973*l*(e). While this statutory authority was not in existence at the beginning of the litigation, under the authority of *Bradley v. School Bd. of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), we hold that § 1973*l*(e) should be applied retroactively to allow the award of attorney's fees in the present case. In *Bradley,* plaintiffs had prevailed in their suit, under the Civil Rights Act of 1871, 42 U.S.C. § 1983, to desegregate the public schools of Richmond, Virginia and were awarded attorney's fees on May 26, 1971. On July 1, 1972, Congress enacted § 718 of Title VII of the Emergency School Aid Act, which granted authority to a federal court to award a reasonable attorney's fee when appropriate in a school desegregation case. 20 U.S.C. § 1617. Upon appeal of the award of attorney's fees, the Fourth Circuit Court of Appeals reversed, holding that the absence of any explicit statutory authority at the time the suit was initiated prevented the award of attorney's fees. The Supreme Court, however, affirmed the district court, holding that, absent statutory direction to the contrary a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice. *Id.* at 2016. Accordingly, because § 718 was enacted while the issues of attorney's fees was pending on appeal, the Supreme Court upheld the district court's award. Likewise, in the present case, § 1973*l*(e) was enacted while the issue of attorney's fees was on appeal before this court and we do not find the retroactive application of that statute to result in "manifest injustice."

## APPENDIX I
## WINN PARISH SCHOOL BOARD

### 1974 COURT–ORDERED PLAN

| Voting District | Members | Population | Black Population | % Black | % Variation | 1970 District Plan |
|---|---|---|---|---|---|---|
| 1 | 1 | 1639 | 1639 | 100 | + .18 | 1 |
| 2 | 1 | 1693 | 465 | 27 | + 3.14 | 1 |
| 3 | 1 | 1678 | 816 | 45 | + 2.57 | 1 |
| 4 | 1 | 1688 | 0 | 0 | + 3.17 | 1 |
| 5 | 1 | 1691 | 458 | 27 | + 3.36 | 1 |
| 6 | 1 | 1819 | 125 | 7 | + 11.19 | 5 |
| 7/8 | 2 | 2627 | 374 | 14 | −19.68 | 2 |
| 9 | 1 | 1594 | 295 | 19 | −2.57 | 4 |
| 10 | 1 | 1931 | 744 | 39 | + 18.03 | 3 |
| TOTAL | 10 | 16,360 | 4916 | 30 | 37.71 | |

1970 School Board Plan, ordered in *Sanders v. Winn Parish School Bd.* was same as above, except districts 1–5 of the present plan were consolidated into one five person multi-member district and districts 6–10 were numbered districts 2–5 (see column 7 above).

## APPENDIX II
## WINN PARISH POLICE JURY

### 1974 COURT–ORDERED PLAN

| Voting District | Number of Representatives | Population | Black Population | % Black | % Variation |
|---|---|---|---|---|---|
| 1 | 1 | 1639 | 1639 | 100 | + .18 |
| 2 | 1 | 1693 | 465 | 27 | + 3.48 |
| 3 | 1 | 1678 | 816 | 45 | + 2.57 |
| 4 | 1 | 1688 | 0 | 0 | + 3.17 |
| 5 | 1 | 1691 | 458 | 27 | + 3.36 |
| TOTAL | 5 | 8389 | 3378 | 40.27 | ** |
| 6–10 * | 5 | 7971 | 1538 | 19.29 | −2.57 |

\* Districts 6–10 are referred to as District B in text and correspond to School Board Districts 6–10.
\*\* Total % variation is 6.05% (District 2 vs. Districts 6–10).

### 1970 COURT–ORDERED PLAN IN ALLEN v. WINN PARISH POLICE JURY

| | | | |
|---|---|---|---|
| A * | 6 | 8389 | 40.27 |
| B ** | 6 | 7971 | 19.29 |
| TOTAL | 12 | 16,360 | |

\* District A consisted of present districts 1–5.
\*\* District B consisted of present districts 6–10.