UNITED STATES of America,
Plaintiff-Appellant,

v.

The **BOARD OF SUPERVISORS OF FORREST COUNTY, MISSISSIPPI,** et al., Defendants-Appellees.

**Nos. 75–3707 and 76–1638.**

United States Court of Appeals,
Fifth Circuit.

April 24, 1978.

---

7.  *See* n. 6, *supra* (original emphasis).

8.  Comment, *supra,* n. 6 at 666–68.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., J. Stanley Pottinger, Asst. Atty. Gen., Brian K. Landsberg, Jessica D. Silver, Walter W. Barnett, U. S. Dept. of Justice, Civ. Rights Div., App. Section, Washington, D. C., for plaintiff-appellant.

Stone D. Barefield, R. W. Heidelberg, James F. McKenzie, F. M. Turner, III, Hattiesburg, Miss., for defendants-appellees.

Before TUTTLE, CLARK, and RONEY, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The United States filed this suit to enjoin the use of certain county election districts, which it claimed perpetuated the dilution of black voting strength in Forrest County, Mississippi. After a three-day hearing, the district court held that the United States had failed to carry its burden of proof. This appeal followed. In an intervening case, this circuit en banc has held that on the same and similar facts there was proof of dilution. *See Kirksey v. Board of Supervisors of Hinds County,* 554 F.2d 139 (5th Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). Because we are bound by *Kirksey,* we vacate and remand.

With the exception of one six-mile-square township which projects from the northwestern corner, Forrest County is rectangular, 36 miles long and twelve miles wide. The population of the county, in the 1970 census, was 54,772; 74% were white and 26% were black. Approximately 78% of the entire population is located in two urban areas in the northwestern portion of the county. The black population of the county is concentrated within that urban area, particularly within the city of Hattiesburg where 88% of the county's black population lives within a three-mile radius of the center of the city.

Like all counties in Mississippi, Forrest County is administered by a board of five supervisors. Prior to 1975 the county supervisors were elected from districts that were malapportioned. In 1973, following lengthy litigation, the district court approved a redistricting plan that met the one person, one vote requirement and nearly equalized the road and bridge mileage within each supervisor's district.[1] To achieve that result the plan arranged the five districts so that each extended from the city of Hattiesburg into the rural areas of the county. In July 1975, the United States filed the present suit seeking to enjoin the elections that were to be held under that redistricting plan. The complaint in that action contended that the plan was unenforceable since it had not been approved under section 5 of the Voting Rights Act.[2] It was also contended that the plan unlawfully diluted the voting strength of the black voters in the county because it split the urban concentration of black voters among several districts. The district court ruled that because the redistricting plan was court-ordered it was not subject to section 5's review provisions. The court therefore dismissed all claims under section 5. The United States appealed in case number 75-3707. A hearing, limited to the dilution claim, was held on the government's motion for a preliminary injunction.[3] The district court denied the motion and the United States appealed in number 76-1638. The elections were conducted in November 1975, using the districting plan which this court held complies with the one person, one vote requirement. The next elections are scheduled to be held in 1979, beginning with primaries in the summer and concluding with a general election in November.

The two appeals were consolidated. The government, however, has conceded that the district court was correct in holding that the plan did not require approval under section 5. See East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976); Kirksey v. Board of Supervisors of Hinds County, 554 F.2d 139, 141 n. 6 (5th Cir. 1977). The decision in case number 75-3707 is therefore affirmed.

In case number 76-1638, the government contends that the present plan of districting for the county unlawfully dilutes the voting power of the black electorate by perpetuating an existent denial of access to the political process. In its opinion the district court carefully articulated the factors in the government's argument and explained why the court had decided against the government on each factor. The factors chosen closely followed the standards listed in this court's en banc opinion in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973), aff'd on other grounds sub nom., East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). The district court's application of those standards, however, has been overtaken by the Kirksey en banc decision of this court, which was not available at the time the district court issued its opinion.

Zimmer and Kirksey have established a multi-step inquiry for determining whether a districting plan unlawfully dilutes a minority's participation in the political process. The testing seeks to determine whether the plan either is a racially motivated gerrymander or perpetuates an existent denial of access to the political process. 554 F.2d at 142. Since the government concedes that the Forrest County plan was drawn without regard for race, we need consider only the second portion of the Zimmer-Kirksey assay. That portion requires that the court first investigate whether the minority community is presently denied access to the political process. Zimmer enumerated several tests to guide that investigation. 485 F.2d at 1305. If a court determines that denial of access exists, a second

---

1. See Fairley v. Patterson, 493 F.2d 598 (5th Cir. 1974). The same districts are also used to elect a number of other county officials.

2. 42 U.S.C. § 1973c.

3. The parties later stipulated that the hearing should be considered as a trial on the merits and that the motion should be treated as a motion for a permanent injunction.

evaluation must determine whether the proposed plan will perpetuate that denial.

In addition to *Kirksey*, we have also considered our recent decisions in *Hendrix v. Joseph*, 559 F.2d 1265 (5th Cir. 1977), and *David v. Garrison*, 553 F.2d 923 (5th Cir. 1977).[4] Both called attention to the necessity for a comprehensive investigation of the facts whenever a claim of dilution is raised. And both involved questions of the adequacy of the findings of fact. Those questions are not involved here for, despite findings by the district court which covered the pertinent factors, we are faced with a record containing facts which *Kirksey* has held will support no other conclusion than that there has been dilution.

*Kirksey* involved Hinds County, the most populous county in the State of Mississippi. Other than differences in area and population, Hinds and Forrest counties are identical with respect to many of the factors that the *Kirksey* court found indicative of a dilution of black voting strength. There has been no slating of candidates and the counties are divided into single-member election districts. Thus here, as in *Kirksey*, two of the *Zimmer* factors are critical—responsiveness of officials and residual effects of past discrimination. Reprinting the district court's findings of fact, 554 F.2d at 152–53, the *Kirksey* court concluded that "[u]nder this evidence it was not possible to reach any conclusion other than that there had existed in Hinds County racial discrimination and official unresponsiveness to the

needs of black citizens." *Id.* at 144. That evidence consisted of eleven elements:

1. no black had been elected to a county office;
2. retention of the poll tax as a requisite to voting until 1966;
3. retention of a literacy test until 1966;
4. conditioning of primary participation upon a pledge of party loyalty;
5. property requirements for candidates for supervisors;
6. designation of the county for the use of federal voting registrars;
7. disqualification of certain black candidates by the county election commission;
8. effect of a lower socio-economic level upon the blacks' ability to participate;
9. a high rate of bloc voting;
10. various electoral mechanisms;
11. lack of responsiveness to the needs of black residents.

Of those elements, four were the result of state laws and necessarily apply to Forrest County as well as to Hinds County.[5] In addition, the parties here stipulated that no black had been elected to county office since the formation of the county in 1907. The testimony discloses that federal voting registrars have been used in Forrest County. Finally, although the evidence in this case is not as strong as that in *Kirksey*, there was evidence of a lack of responsiveness on the part of elected officials.[6] In

---

**4.** *See also Lipscomb v. Wise*, 551 F.2d 1043 (5th Cir. 1977), *cert. granted,* —— U.S. ——, 98 S.Ct. 716, 54 L.Ed.2d 750 (1978); *Paige v. Gray*, 538 F.2d 1108 (5th Cir. 1976); *McGill v. Gadsden County Commission*, 535 F.2d 277 (5th Cir. 1976); *Nevett v. Sides*, 533 F.2d 1361 (5th Cir. 1976); *Wallace v. House*, 515 F.2d 619 (5th Cir. 1975), *vacated and remanded,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976); *Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109 (5th Cir. 1975); *Robinson v. Commissioners Court, Anderson County*, 505 F.2d 674 (5th Cir. 1974); *Moore v. LeFlore County Board of Election Commissioners*, 502 F.2d 621 (5th Cir. 1974); *Turner v. McKeithen*, 490 F.2d 191 (5th Cir. 1973).

**5.** The four state-wide elements were the retention of poll tax as a requisite to voting; the literacy requirement, Mississippi Constitution § 244, implemented in Miss.Code Ann. § 3213 (1942) (*repealed* 1965 Miss. Laws ch. 16); the property requirement for county officers, Miss. Code Ann. § 19–3–3 (1972); and the electoral mechanisms of majority vote requirement, Miss.Code Ann. §§ 23–3–69, 23–5–197, 23–5–203 (1972), prohibition against single shot voting, Miss.Code Ann. § 3110 (1942) (*repealed* 1970 Miss. Laws ch. 506), and the requirement of at-large elections for county election commissioners, Miss.Code Ann. § 23–5–3 (1972).

**6.** The district court held that the United States' proof of lack of responsiveness was not persuasive because the area chosen by the govern-

short, the combination of state-wide factors, which are legally bound to be present here, with county-wide factors similar to those in Hinds County means that only three of *Kirksey*'s eleven elements were not present in this case. There was no proof that a loyalty oath had been used in Forrest County, no proof that the county election commission had disqualified black candidates,[7] and no testimony that blacks in Forrest County were of a lower socio-economic level than whites. The absence of those elements is insufficient to distinguish this case from *Kirksey*. *Kirksey* did not require all factors to be present to demonstrate denial of access to the political process. Rather, it held such discrimination could be demonstrated by proof that a number of these elements were present. 544 F.2d at 143. Because the aggregate of those same factors was clearly present here, *Kirksey* requires that we set aside the district court's factual conclusion.

Thus far in our reasoning process we have been concerned with the past. We have been guided by the clear and explicit holding of *Kirksey* that facts similar to those present in Forrest County demonstrate a history of dilution of access by blacks to the political process. When we turn our attention to the present and the future, the guidance of *Kirksey* is neither so clear nor so explicit. *Kirksey* does mandate that race must be taken into account in formulating a redistricting plan whenever there has been a history of dilution of black participation. 554 F.2d at 151. But *Kirksey* does not expressly require the creation of a district that has a majority of registered voters who are black.[8] The goal of any remedy is to assure "effective black minority participation in democracy."

*Kirksey*, 554 F.2d at 151. But, of course, in a democracy the minority loses at the ballot box. In recognition of the inevitability of such a result, this court has concentrated upon access to the political process rather than assurance of a particular result. It is because access is a more difficult concept to measure than is result that this court has emphasized that "[t]he problem is not susceptible of simplistic solutions, however seductive they may appear. No mechanistic solution is an alchemistic philosopher's stone that will turn all the problems of past and present to future gold." *Kirksey*, 554 F.2d at 152.

In applying the second part of the *Zimmer* test which investigates whether the proposed district lines will perpetuate the existing denial of access, *Kirksey* followed its own admonition by concentrating upon facts peculiar to the situation presented there. In Hinds County, blacks comprised almost forty percent of the population. The district lines proposed by the supervisors and adopted by the district court, while essentially the same in the county's rural areas, had been substantially altered inside the city of Jackson, with the result that the new districts split an urban black population among five districts so no district contained a voting age population more than fifty percent black. In addition, there was testimony that under such a plan "it would be unlikely if not impossible for blacks to ever elect a candidate of their choice." 554 F.2d at 149. The *Kirksey* court noted those statistics and that unrefuted testimony in reaching its conclusion that the Hinds County plan, which fragmented "a geographically concentrated minority voting community in a context of bloc voting," *id.,* was impermissible.

ment was atypical and because the county had produced sufficient evidence to rebut the testimony presented by the government. But, as the *Kirksey* court noted, 554 F.2d at 144–45, lack of responsiveness may be proved both by present evidence and by the lingering effects of the past discrimination. Moreover, the record makes it clear that Forrest County did no more than did Hinds County in carrying its burden of proving that the past discrimination did not have residual effects that bore on the question of lack of responsiveness of county officials.

7. Comparable actions, however, were taken by Forrest County officials to prevent the registration of blacks. *See United States v. Lynd,* 349 F.2d 790 (5th Cir. 1965).

8. Only Judge Gee's special concurrence holds that such a district is required by *Kirksey*. 554 F.2d at 155.

■ The record in the present case is too sparse for us to determine whether a similar analysis would be appropriate in Forrest County. Over one-fourth of this county's population is black. It is apparent therefore that some division of the black voters among supervisors' districts must be made to comply with the one person, one vote standard. It is not apparent whether the present plan which spreads black voters through four supervisors' districts perpetuates the past denial of access. There is no testimony in the record concerning the effect of the present plan upon effective black participation in the democratic process.

The indicators of past denial of access are written in the history of Forrest County; future access cannot be guaranteed by eradicating those indicators. Thus, the election of a black as an official in the county will not necessarily indicate that blacks have achieved full access to the political affairs of the county. *Kirksey,* 554 F.2d at 149 & n. 21. A court-ordered racial gerrymander which would assure that blacks form a sizeable electoral majority in a single district may not be nearly as effective a guarantee of access as the creation of two or more districts with substantial black voter populations such that all candidates in those districts must be responsive to the needs and aspirations of the black electorate. District lines should not be made to bear the whole weight. Just as the location of such lines was not the sole cause of the past denial of access, their redrawing cannot be the sole harbinger of future full access.

The choices available to the district court lie between two poles; at the one, the black voting strength could be concentrated within a single district; at the other, the black voters could be spread among several districts. No court has devised a formula which will resolve the difficult question of where the solution lies for Forrest County. It is for the district court to say how effective black participation in the future political processes of Forrest County may be guaranteed.[9] The answer cannot be gleaned from academic commentators; the diversity of their opinions only serves to confirm the difficulty of the choices the district court must face on remand.[10] It is probable, therefore, that the district court will consider it necessary to hear additional testimony regarding the composition and form of supervisors' districts that will ensure effective black participation. As it considers appropriate remedies, the court must also be aware of the need for speedy resolution caused by the approaching elections. *Cf. Parnell v. Rapides Parish School Board,* 563 F.2d 180 (5th Cir. 1977).

NO. 75–3707 AFFIRMED.

NO. 76–1638 VACATED and REMANDED.

9. Since 88% of the blacks in Forrest County live in an urban area, the activities of the supervisors, which are devoted primarily to county affairs, are of little concern to them. The creation of absolute power to elect one member of a five-member board may be considered a waste of effort. However, the court must also be aware of the fact that supervisors' beat lines also form the election districts for individual county officeholders, such as the justice court judges and constables, who perform their duties in both urban and rural parts of the county. The effectiveness of the black voters must therefore be gauged by the responsiveness of all county officials and not only the supervisors.

10. *See, e. g.,* Banzhaf, "Multi-Member Electoral Districts—Do They Violate the 'One Man, One Vote' Principle," 75 Yale L.J. 1309 (1966); Note, "Proportional Representation by Race: The Constitutionality of Benign Racial Redistricting," 74 Mich.L.Rev. 820 (1976); Note, "Compensatory Racial Reapportionment," 25 Stan.L.Rev. 84 (1972); Comment, "Political Gerrymandering: A Statutory Compactness Standard as an Antidote for Judicial Impotence," 41 U.Chi.L.Rev. 398 (1974).