John BUSKEY and Charles D. Langford, individually and on behalf of others similarly situated; and the Montgomery Improvement Association, Inc., Plaintiffs,

Donald V. Watkins, Plaintiff-Intervenor,

v.

Luther L. OLIVER, Lewis Golson, Alice Reynolds, John Starr, Jr., and William Nunn, individually and as members of the Montgomery, Alabama City Council; Emory Folmar, individually and as Mayor of the City of Montgomery, Alabama; and the City of Montgomery, Alabama, a municipal corporation, Defendants.

Civ. A. No. 81–557–N.

United States District Court,
M.D. Alabama, N.D.

June 10, 1983.

---

Solomon S. Seay, Jr., Gray, Seay & Langford, Montgomery, Ala., for plaintiff.

Donald V. Watkins, Montgomery, Ala., pro se.

G. Dennis Nabors, Ball, Ball, Duke & Matthews, George B. Azar, Azar, Campbell & Azar, and H.A. Scott, Montgomery, Ala., for defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

The plaintiffs in this cause of action seek declaratory and injunctive relief against the enforcement of Montgomery City Ordinance No. 47–81, which redraws the council districts for the city. The plaintiffs are John Buskey and Charles Langford, two black voters of the City of Montgomery, suing on behalf of themselves and all other black voters and potential black voters of the city;[1] Donald Watkins, a black voter of the city and a member of the city council; and the Montgomery Improvement Association, Inc., an organization whose primary membership consists of black residents of the city and whose goal is the increased participation of black persons in the political process.[2] The defendants are the City of Montgomery; its mayor, Emory Folmar; and five of the city's council members, Luther Oliver, Lewis Golson, Alice Reynolds, John Starr, Jr., and William Nunn. The plaintiffs claim that City Ordinance No. 47–81 was passed with the purpose and will have the result of diluting black voting strength in the city in violation of section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C.A. § 1973.[3] For reasons which follow, the court concludes that the plaintiffs' claim has merit and that, accordingly, the plaintiffs are due appropriate relief.[4]

## I.

The City of Montgomery is the capital of the State of Alabama. According to the 1980 census figures the population of the city is approximately 178,000, of whom approximately 39.2% are black. Its mayor is white and of its nine city council members,

1. By order dated October 5, 1982, this court certified as a class "all black voters and potential black voters residing in the City of Montgomery, to be represented by the named plaintiffs Buskey and Langford." Fed.R.Civ.P. 23(b)(2).

2. In its October 5, 1982, order this court concluded that the association "may bring this action on behalf of itself and its members in accordance with the representational status of plaintiff as recognized in *NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963); *see Sierra Club v. Morton,* 405 U.S. 727, 739–40, 92 S.Ct. 1361, 1368–69, 31 L.Ed.2d 636 (1972)."

3. In support of their "dilution" claim, the plaintiffs rely alternatively on the fourteenth and fifteenth amendments to the United States Constitution and 42 U.S.C.A. §§ 1981, 1983. However, in view of the disposition of the claim in favor of the plaintiffs under section 2, there is no need to address the alternative bases for the claim.

The plaintiffs also present an alternative claim that the ordinance was passed in violation of an "annexation agreement" signed by the city's mayor and eight of the city's nine council members in 1978. Again, in view of the disposition of this case in favor of the plaintiffs on the section 2 claim, there is no need to address this alternative claim.

4. The court has subject matter jurisdiction over the section 2 claim, 28 U.S.C.A. §§ 1331, 1343. Declaratory relief is also appropriate pursuant to 28 U.S.C.A. § 2201.

elected by district, five are white and four are black.

The black citizens of the City of Montgomery have a long history of being subjected to official and pervasive discrimination simply because of their race. The offenders have been their city, their county, and their state. This discrimination, as documented in the records of this court, has manifested itself in practically every area of social and economic interaction, including maintaining racially segregated public transportation, *Browder v. Gayle,* 142 F.Supp. 707 (M.D.Ala.), *aff'd mem.* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956); maintaining racially segregated public parks and recreational facilities, *Smith v. YMCA,* 316 F.Supp. 899 (M.D.Ala.), *aff'd as modified,* 462 F.2d 634 (5th Cir.1972); *Gilmore v. City of Montgomery,* 176 F.Supp. 776 (M.D.Ala.1959), *aff'd as modified,* 277 F.2d 364 (5th Cir.1960); maintaining racially segregated municipal airport facilities, *United States v. City of Montgomery,* 201 F.Supp. 590 (M.D.Ala.1962); maintaining racially segregated bus terminals, *Lewis v. Greyhound Corp.,* 199 F.Supp. 210 (M.D.Ala. 1961); excluding black persons from the public library and museum, *Cobb v. Montgomery Library Board,* 207 F.Supp. 880 (M.D.Ala.1962); maintaining a segregated public school system, *Carr v. Montgomery County Board of Education,* 232 F.Supp. 705 (M.D.Ala.1964), 377 F.Supp. 1123 (M.D. Ala.1974), *aff'd* 511 F.2d 1374 (5th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975); use of discriminatory examinations in promoting police officers to the position of sergeant, *Williams v. City of Montgomery,* No. 3739–N, Order and Opinion (M.D.Ala. April 30, 1979); and racial discrimination in the hiring of county probate clerks, *Sims v. Montgomery County Comm'n,* 544 F.Supp. 420 (M.D.Ala.1982).

In particular, official policies of racial discrimination have been specifically aimed at preventing black persons from participating in the political process. Black persons have been denied the right to register to vote, *United States v. Alabama,* 252 F.Supp. 95 (M.D.Ala.1966); and have been discriminated against in exercising their right to register, *United States v. Parker,* 236 F.Supp. 511 (M.D.Ala.1964); *United States v. Penton,* 212 F.Supp. 193 (M.D.Ala. 1962). In *United States v. Alabama,* the court found that Alabama's poll tax was calculated to disfranchise black voters, and further that

> from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society.

252 F.Supp. at 101. In *United States v. Penton,* when confronted with tactics by the Montgomery County Board of Registrars to exclude black voters, the court found that

> the defendant State and its agents [Montgomery County officials], have engaged in procedures and practices which have favored white applicants and discriminated against Negro applicants who were seeking to become registered voters.

212 F.Supp. at 197.[5]

Moreover, the history of official economic, educational, social, and political inequality still adversely affects the lives of many of the city's black citizens and, in particular, their access to the political process. As the former Fifth Circuit observed in *Kirksey v. Board of Supervisors,* 554 F.2d 139, 145 (5th Cir.) (en banc), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977): "It is not necessary in any case that a minority prove such a causal link. Inequality of access is an inference which flows from the existence of economic and educational inequalities." The rate of voter registration among voting age black persons in the City of Montgomery is substantially less than that among voting age white persons. Black persons are substantially less well educated than white persons. The black unemployment rate is substantially higher than the white rate. The average income for black households is only 51.6% of that for white house-

---

**5.** A more extensive list of court cases cataloging this history of official racial discrimination in the political process and in social and economic interaction is found in *Whitfield v. Oliver,* 399 F.Supp. 348 (M.D.Ala.1975).

holds. The percentage of persons below the poverty level is approximately 78% black and 22% white; and 38.4% of all black persons are below the poverty level, while only 7.1% of all whites are. Of those arrested by the city police in 1981, 60.8% were black and 39.2% were white.[6]

## II.

The significant events leading up to the passage of Ordinance No. 47–81 began in 1975. In that year the city government changed from a commission form, with all governing city officials elected at-large, to a mayor-council form, with a mayor elected at-large and nine council members elected by districts. Under the districting plan implemented in 1975 and drawn according to the 1970 census figures, five of the city's districts—districts 1, 2, 7, 8, and 9—had white populations of 80% or higher; and two of the city's districts—districts 3 and 5—had black populations of 78% or higher. The remaining two districts—districts 4 and 6—had, according to the 1970 census figures, white/black population percentages of 47.09/52.91% and 59.46/40.54%, respectively. The racial makeup of the city in 1975, based on 1970 census figures, was 66–67% white and 33–34% black.[7]

In the election held pursuant to the 1975 districting plan, however, five white and four black council members were elected. As expected, the five districts with 80% or higher white populations elected white council members, and the two districts with 78% or higher black populations elected black council members. District 4, which according to the 1970 census was only 52.91% black was able to elect a black council member because the district contains a large predominantly white military base which has a low voter turnout. District 6, which according to the 1970 census was 59.46% white, also elected a black council member because since 1970 substantial "white flight" and black immigration had occurred as a result of the implementation of a school desegregation plan in the area. According to the 1980 census, district 6's black population increased to approximately 92.7%. The 59.46% white majority attributed to district 6 by the 1970 census figures did not accurately reflect the district's white population by 1975.

In 1976 the residents of an 89.5% black area known as Southlawn, located southwest of the city, petitioned the city for annexation. And in 1977 Emory Folmar, then president of the city council, became acting mayor and shortly thereafter was elected mayor. Folmar, however, did not submit the Southlawn petition to the council. The petition would have increased the city's black population by 1.5%, from 41.1% to 42.6%, according to 1980 census figures. Instead, he devised and submitted a "master annexation plan" that proposed annexation of two predominantly white areas in addition to the predominantly black Southlawn area. Folmar's plan would decrease the city's black population by .9%, from 41.1% to 39.2%, according to 1980 census figures.

The mayor's master annexation plan passed the city council by a vote of 7–2, with two of the four black council members opposing the plan because they believed the plan diluted black voting strength in the city. The plan, however, did not automatically become law. In order for an annexation plan to become law, the plan must also be approved by the state legislature, the voters of the annexing city, and the voters of the proposed annexed areas. Further-

6. The above findings were based primarily on governmental data compiled in 1981 and 1982 and submitted to the court by the plaintiffs.

7. The following table reflects the council districts and racial makeup as drawn in 1975 based on census figures from 1970:

| District | Population | %White | %Black |
|---|---|---|---|
| 1 | 15,531 | 98.97 | 1.03 |
| 2 | 15,548 | 81.33 | 18.67 |
| 3 | 15,410 | 21.48 | 78.52 |
| 4 | 15,500 | 47.09 | 52.91 |
| 5 | 15,508 | 16.01 | 83.99 |
| 6 | 15,302 | 59.46 | 40.54 |
| 7 | 15,345 | 86.14 | 13.86 |
| 8 | 15,380 | 99.90 | 0.10 |
| 9 | 15,250 | 85.09 | 14.91 |
| TOTAL | 138,774 | 66.1 | 33.9 |

more, as an unwritten prerequisite to passage by the state legislature, a plan must be approved by four-fifths of the local delegation of the legislature. Folmar's master annexation plan was unable to pass the state legislature because two black members of the six-person local delegation opposed the plan as a possible dilution of the black voting strength in the city. After a period of negotiation the two black members of the local delegation indicated that they would allow legislative passage of the mayor's master annexation plan on the condition that the mayor and city council members enter into an "annexation agreement," which had been drafted by Folmar and Joe Reed, the council member from district 3. According to the agreement, the mayor and council members, "in a spirit of cooperation and in an effort to ensure the City's growth through annexation, do hereby agree to support the re-districting plan, effective in 1983, that most nearly preserves the current racial makeup of the Montgomery City Council." The agreement also required that the 1983 redistricting plan comply with applicable law; that the plan meet the constitutional requirement of one-person one-vote; that the redistricted districts be contiguous; and that no present member of the council be gerrymandered out of his or her district.[8] The annexation agreement was signed by the mayor and all council members except one who was ill. After the parties signed the annexation agreement, the two black members of the local legislative delegation withdrew their opposition and Folmar's master annexation plan passed the Alabama legislature.

Folmar's master annexation plan then went before the voters of the city and the proposed annexed areas for approval. The proposed annexed areas were divided into three separate areas—the east, the south, and the west, including Southlawn. Black leaders encouraged voters to support the mayor's master annexation plan. Within the city and the western proposed annexed area, including Southlawn, the annexation plan passed with a significant margin of success. Within the eastern and southern proposed annexed areas, however, the margin of victory was much closer. The eastern area approved annexation by eleven votes, and the southern area, after a judicial challenge to the vote, approved annexation by only two votes. Annexation then became law for all the proposed areas, with the areas to be considered officially a part of the city of Montgomery on January 1, 1980.

In 1979, before the proposed annexed areas became a part of the city, a second municipal election was held as required by law. The results of the election were the

---

8. The full text of the annexation agreement is as follows:

WHEREAS, it is the desire of the undersigned officials of the City of Montgomery to expand the City Limits of the City of Montgomery; and,

WHEREAS, such expansion will require certain portions of Montgomery County not currently in the City of Montgomery to be annexed to said City; and,

WHEREAS, such annexation will increase the population of the City of Montgomery by an estimated 18,000 citizens; and,

WHEREAS, such increase in population will require an increase in the population size of each Montgomery City Council District; and,

WHEREAS, such increase could have an adverse effect on the current racial makeup of the said City Council; and,

WHEREAS, it is not the desire of the undersigned officials to dilute the current racial makeup of the said City Council;

NOW, THEREFORE, We, the undersigned officials of the City of Montgomery, in a spirit of cooperation and in an effort to ensure the City's growth through annexation, do hereby agree to support the re-districting plan, effective in 1983, that most nearly preserves the current racial makeup of the Montgomery City Council, so long as said plan complies with applicable law in general, and with the following conditions in particular:

1. That any Montgomery City Council District drawn must meet the "one man, one vote" concept as required by the Federal Courts.

2. That the Montgomery City Council Districts must be contiguous.

3. That no Montgomery City Council member will be gerrymandered out of his or her district as a result of re-districting.

We further agree that, to insure that the spirit of this agreement is carried out, to submit, the 1983 plan to the United States Department of Justice for appropriate review.

same racially, with white council members being elected from predominantly white districts 1, 2, 7, 8, and 9, and black council members being elected from predominantly black districts 3, 4, 5, and 6. The council members today are the same as those elected in 1979, and are as follows:

| District | Name | Race |
|----------|------|------|
| 1 | Willie Peak | White |
| 2 | Lewis Golson | White |
| 3 | Joe Reed | Black |
| 4 | Mark Gilmore | Black |
| 5 | Luther Oliver | Black |
| 6 | Donald Watkins | Black |
| 7 | Alice Reynolds | White |
| 8 | John Starr | White |
| 9 | William Nunn | White |

Folmar, as mayor of the city, was required by law to present a redistricting plan to the city council upon annexation or decennial census. Because of the nearness of the annexation to the 1980 census he decided to wait until after the census to present his redistricting plan to the council. According to the 1980 census figures, the racial picture for the city by district, without annexation, was as follows:

| District | Population | %White | %Black |
|----------|------------|--------|--------|
| 1 | 23,216 | 95.4 | 3.5 |
| 2 | 16,822 | 69.3 | 30.3 |
| 3 | 11,180 | 15.6 | 84.2 |
| 4 | 13,336 | 30.9 | 67.9 |
| 5 | 13,145 | 3.4 | 96.4 |
| 6 | 18,282 | 6.0 | 92.7 |
| 7 | 12,680 | 78.5 | 21.1 |
| 8 | 19,554 | 95.1 | 3.7 |
| 9 | 18,042 | 86.5 | 12.9 |

In the spring of 1981, Folmar drafted a redistricting plan—for which the racial makeup is as follows based on 1980 census figures—which in compliance with the annexation agreement, divided the city into roughly equal population districts and maintained the residence of each council member within his or her district:

| District | Population | %White [9] | %Black |
|----------|------------|------------|--------|
| 1 | 20,168 | 90.8 | 9.2 |
| 2 | 19,587 | 94.5 | 5.5 |
| 3 | 19,938 | 38.5 | 61.5 |
| 4 | 19,619 | 33.8 | 66.2 [75%] [10] |
| 5 | 20,191 | 12.0 | 88.0 |
| 6 | 19,495 | 10.2 | 89.8 |
| 7 | 19,799 | 84.5 | 15.5 |
| 8 | 19,474 | 91.6 | 8.4 |
| 9 | 19,886 | 91.9 | 8.1 |

Folmar's redistricting plan was, however, significant in other ways: First, the plan substantially increased the minimum white majority in all five of the predominantly white districts from approximately 69.3% to 84%; second, it maintained black majorities of at least 75% [11] in three of the four predominantly black districts; and third and most significantly, it reduced the black majority in district 3 by 22.7 percentage points, from 84.2% to 61.5%.

When asked to explain why the black majority in district 3 was reduced by 22.7 percentage points, Mayor Folmar explained as follows. He stated that the city council is divided between those whom he considers and calls his "allies" and those whom he does not consider his allies. Golson, Oliver, Reynolds, Starr, and Nunn he considers his allies; and Peak, Reed, Watkins, and Gilmore, he does not. But more specifically, Folmar noted that Reed, the black council member from district 3, "has been a political enemy of mine from the day we sat down on the council" and that his redistricting plan "certainly wasn't designed to help Mr. Reed." And in the following testimony he explained in more detail how he accommodated Reed in his plan:

[Seay]. Did you make the statement that—you were quoted on July

9. The parties did not calculate for the court the white percentage figures for the plan. Rather, these figures are only estimates by the court. The court arrived at the figures simply by subtracting each of the black percentage figures from 100. Since the percentage of the city population that can be accounted for as neither black nor white is only .7%, these estimates should be correct within a few tenths of a percentage point.

10. Under all the redistricting plans drafted by Folmar and the council members, district 4 is listed as having a black population of 66–67%. The evidence reflects, however, that this district is effectively 75% black because it contains a large, predominantly white military base with a very low voter turnout.

11. See note 10, supra.

14th, '81, Alabama Journal, as saying, I am going to design a district to accommodate those who will work with me. And whatever is left over, that is what he gets.

[Folmar]. Basically that is an accurate statement. It has nothing to do with race. It is strictly politics.

Q. Did you make the statement I do not care which black gets elected in District 3 as long as it ain't him, referring to Mr. Reed?

A. I am not sure that is a totally accurate statement. But that is certainly the essence of my sentiment.

Moreover, Mayor Folmar explained that he arrived at the figure of 61.5% for Reed's district in the following manner:

I had checked other areas across the United States that had had redistricting where there had been racial numerical problems of getting that worked out, and I found that everything at over fifty-five percent had passed muster. So I thought sixty-one and a half percent was ample.

The message from Folmar's testimony is plain. In drafting his redistricting plan Folmar's goal with regard to Reed was to take affirmative steps to decrease the likelihood that Reed would be reelected; and he sought to achieve this goal by reducing the black majority in Reed's district to just above a level that would withstand a court challenge.

After Folmar presented his redistricting plan to the city council, it was referred to the city's Intergovernmental Relations Committee, which was chaired by Reed.

Reed drafted a plan that maintained the residence of each council member within his or her district, met the requirements of one-person one-vote, and yet had a black majority of 82.5% for district 3, his district. The Reed plan also continued Folmar's policy of maximizing racial majorities for the other council members; the plan maintained white majorities in the high 80%'s in all the white council members' districts and maintained black majorities of at least 75% in all the black council members' districts.[12] Peak, who was also a member of the committee, then took Reed's plan and modified it. Under the Peak plan, which also maintained the residence of each council member in his or her district and met the requirements of one-person one-vote, district 3 had a black majority of 81.5%. The Peak plan also continued Folmar's working formula of maximizing racial majorities in the other districts; the plan maintained white majorities in the high 80%'s in all the white council members' districts and maintained black majorities of at least 75% in all the black council members' districts.[13] The committee adopted the Peak plan.

In the meantime, Luther Oliver, the black council member from district 5, informed Folmar that 61.5% for Reed's district was unacceptable and that at least 65%—the level Folmar and the other defendants contend constitutes a legally "safe" black district—was necessary. Oliver, therefore, with Folmar's approval modified Folmar's plan to increase the black majority in Reed's district to 68%, while maintaining, as much as possible, maximum racial majorities in the other districts, maintaining the

---

12. The racial makeup, based on 1980 census figures, for the Reed plan was as follows:

| District | Population | %White | %Black | %Other |
|---|---|---|---|---|
| 1 | 19,213 | 94.0 | 4.7 | 1.3 |
| 2 | 20,073 | 90.6 | 8.4 | 1.0 |
| 3 | 19,724 | 17.2 | 82.5 | 0.3 |
| 4 | 19,809 | 32.4 | 66.6[75.0] | 1.0 |
| 5 | 19,447 | 7.5 | 92.2 | 0.3 |
| 6 | 20,191 | 19.3 | 80.3 | 0.4 |
| 7 | 19,934 | 94.6 | 4.4 | 1.0 |
| 8 | 19,832 | 87.8 | 11.3 | 0.9 |
| 9 | 19,634 | 96.9 | 2.2 | 0.9 |

*See* note 10, *supra,* for an explanation of the 75% figure in the district 4 line.

13. The racial makeup, based on 1980 census figures, for the Peak plan was as follows:

| District | Population | %White | %Black |
|---|---|---|---|
| 1 | 19,891 | 97.4 | 2.6 |
| 2 | 19,474 | 90.2 | 9.8 |
| 3 | 19,937 | 18.5 | 81.5 |
| 4 | 19,812 | 33.4 | 66.6 [75.0] |
| 5 | 19,447 | 7.8 | 92.2 |
| 6 | 19,854 | 19.6 | 80.4 |
| 7 | 19,729 | 96.2 | 3.8 |
| 8 | 19,774 | 87.7 | 12.3 |
| 9 | 19,939 | 96.3 | 3.7 |

The court estimated the white percentages, *see* note 9, *supra.* As to the figure of 75% for district 4, *see* note 10, *supra.*

residence of each council member in his or her district, and meeting the requirements of one-person one-vote. Under Folmar's modified plan white council members again had white majorities in the high 80%'s in their districts and other black council members had black majorities of at least 75% in their districts. On July 28, 1981, Reed reported to the city council that the Intergovernmental Relations Committee recommended the adoption of the Peak plan. The council, however, rejected the Peak plan and adopted Folmar's modified plan, with those members whom the mayor calls his allies supporting his modified plan and those whom he considered not to be his allies supporting the Peak plan. The racial picture for the city under Folmar's modified plan, which was adopted as City Ordinance No. 47–81, was as follows:

| District | Population | %White [14] | %Black |
|---|---|---|---|
| 1 | 19,868 | 91.7 | 8.3 |
| 2 | 20,132 | 98.2 | 1.8 |
| 3 | 20,135 | 32.0 | 68.0 |
| 4 | 19,619 | 33.8 | 66.2 [75.0] [15] |
| 5 | 19,636 | 10.2 | 89.8 |
| 6 | 19,523 | 10.2 | 89.8 |
| 7 | 19,584 | 87.5 | 12.5 |
| 8 | 19,474 | 91.6 | 8.4 |
| 9 | 19,886 | 91.9 | 8.1 |

Folmar when asked why he supported his modified plan over the Peak plan explained that the critical factor was Reed's involvement in the Peak plan. Folmar testified as follows:

[Seay]. .... I believe you were quoted again by the Journal somewhere, I believe, as saying that the problem with the Peak plan is that it is a warmed-over Reed plan or words to that effect. Do you recall that?

[Folmar]. Yes. I think that is an accurate statement. And that probably more generally sums up my objections to it than anything else.

Also, even though Reed's district is 68% black under the city's redistricting plan, the evidence reflects that if only the voting population is considered, the district is 63% black. Moreover, the district has a predominantly black state university within its bounds, and if the university's dormitory students, who are generally considered to be residentially unstable, are discounted, then the district's black voting age population is 60%.

Finally, the evidence before the court reflected that the city council is steeped in racial tension and mistrust, with the tension and mistrust being most acute between Folmar and Reed.

### III.

In *City of Mobile v. Bolden,* 446 U.S. 55, 60, 62, 100 S.Ct. 1490, 1496, 1497, 64 L.Ed.2d 47 (1980), the plurality opinion for the Supreme Court stated that section 2 of the Voting Rights Act of 1965, as it then read, "no more than elaborates upon the Fifteenth Amendment," and concluded that a violation of the section required racially discriminatory purpose.[16] In 1982 Congress amended the section to remedy the restrictive interpretation announced in *Bolden.*[17]

14. *See* note 9, *supra.*

15. *See* note 10, *supra.*

16. Section 2, as considered by the Court in *Bolden,* read as follows:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.

42 U.S.C.A. § 1973 (West 1981).

17. Section 2, as amended in 1982, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less

The section as amended broadened voting rights violations to encompass not only official action taken or maintained for a racially discriminatory purpose but official action which results in a denial or abridgement of the right of any citizen to vote on account of race.[18] Thus, a violation of section 2 occurs either when official action is taken or maintained for a racially discriminatory *purpose* or when such action *results* in a denial or abridgement of the right of any citizen to vote on account of race.

■■■ Purposeful discrimination need not be the sole motivation for the challenged action in order for the action to fall within the proscription of section 2; rather, discriminatory purpose need only be one of the motivating factors to trigger strict judi-

cial review. *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *see also Rogers v. Lodge,* —— U.S. ——, —— n. 5, 102 S.Ct. 3272, 3276 n. 5, 73 L.Ed.2d 1012 (1982). Furthermore, proof of purposeful discrimination in voting may be made either by direct or circumstantial evidence.[19] However, proof of discriminatory result may be made by establishing a number of relevant "circumstantial factors," primarily those found in the pre-*Bolden* cases of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).[20] The

---

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973 (West Supp.1983). The senate Judiciary Committee Report on the amendment states:

The proposed amendment to Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden.* In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process. Under this results test, it was not necessary to demonstrate that the challenged election law or procedure was designed or maintained for a discriminatory purpose.

S.Rep. No. 97–417, *reprinted in* 1982 *U.S.Code Cong. & Ad.News at 177, 192–193.*

**18.** The Senate Judiciary Committee Report explains that:

The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdic-

tion in question, results in minorities being denied equal access to the political process. S.Rep. No. 97–417, *supra* at 205 (footnote omitted).

**19.** The Senate Judiciary Committee Report explains that a plaintiff "may establish discriminatory intent for the purpose of this section through direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions which 'is one type of quite relevant evidence of racially discriminatory purpose.'" S.Rep. No. 97–417, *supra* at 205 n. 108, quoting *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1979). *See also Rogers v. Lodge, supra,* —— U.S. at ——, 102 S.Ct. at 3276.

**20.** Typical factors, as enumerated by the Senate Judiciary Committee Report, include but are not limited to the following:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

plaintiffs in the present case contend that Montgomery City Ordinance No. 47–81, redistricting the city, was passed with the purpose or, alternatively, will have the result of diluting black voting strength in the city in violation of section 2, as amended. The evidence presented to the court substantiates and this court finds that a motivating factor behind the passage of the ordinance was to dilute the black voting strength in district 3, and, since district 3 is a part of the city, to dilute black voting strength in the city.

The right to vote may be denied or abridged by dilution just as effectively as by simply prohibiting the franchise.[21] Furthermore, retrogression, as is claimed in the instant case, may constitute unlawful vote dilution.[22] *See, e.g., Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1160 (5th Cir.1981) (district lines redrawn to transfer substantial number of minority voters from one district to another); *Kirksey v. Board of Supervisors,* 554 F.2d 139, 143, 149 (5th Cir.) (en banc), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977) (redistricting plan fragmented geographically concentrated minority group); *Robinson v. Commissioners Court,* 505 F.2d 674, 678 (5th Cir.1974) (concentration of black voters in

one district "diced" into three parts as a result of redistricting). In the instant case the evidence firmly establishes that the plaintiffs have been the victims of the purposeful denial of the right to vote by dilution, in the form of retrogression, on account of their race.

The evidence reflects a black citizenry still bereft of full economic, social, and political equality due to the lingering effects of a past, pervasive governmental policy of official discrimination based solely on race; it reflects a city still polarized by race, with only white council members being elected from predominantly white council districts and with only black council members being elected from predominantly black council districts; and it reflects a city council suffering from racial discord among its members and the city's mayor. This was the setting for the enactment of Montgomery City Ordinance No. 47–81.

In his original redistricting plan Mayor Emory Folmar, who by statute was responsible for drafting a redistricting plan for the city, tailored each of the council member districts, except district three, in such a manner as to increase the majority race in the district as much as possible or, if the district was already overwhelmingly of one

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 97–417, *supra* at 206–07 (footnotes omitted). Of these "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* Because voting rights violations may take many forms, evidentiary factors and their relevance may vary from case to case.

21. The Senate Judiciary Committee took special care to explain that:

Section 2, as amended, adopts the functional view of "political process" used in *White* rather than the formalistic view espoused by the plurality in *Mobile.* ... [T]his section

without question is aimed at discrimination which takes the form of dilution, as well as outright denial of the right to register or to vote.

S.Rep. No. 97–417, *supra,* at 208 n. 120. *See City of Port Arthur v. United States,* —— U.S. ——, ——, 103 S.Ct. 530, 534, 74 L.Ed.2d 334 (1982) ("... the right to vote may be denied by dilution or debasement just as effectively as by wholly prohibiting the franchise").

22. The specific challenge presented in this case is not one of alleged vote dilution resulting from the operation of multimember voting districts. *See e.g., White v. Regester, supra; Bolden, supra; Zimmer v. McKeithen, supra.*

Moreover, it should be added that the Senate Judiciary Subcommittee on the Constitution, which was generally critical of the 1982 amendments to the Voting Rights Act, found that a section 2 claim based on retrogression was a more discernible section 2 offense than a claim based on multimember district dilution because a retrogression claim would present a clearly defined "starting point" from which to measure the alleged dilution of minority voting strength. S.Rep. No. 97–417, *supra,* at 309 n. 106.

race, to maintain that level. With all the majority white districts he succeeded and maintained white populations no lower than 84%. With the majority black districts 4, 5, and 6, he again succeeded though not to the extent he succeeded with the majority white districts. He maintained black majorities of at least 75%. District 3, however, was the oddity. Folmar reduced the black majority in district 3 from 84.2% to 61.5%, by 22.7 percentage points. Furthermore, under Folmar's modified plan, adopted by the city as Ordinance No. 47–81, district 3 still stood out in marked contrast to the other districts. Under his modified plan, as with his original plan, he maintained white majorities no lower than 87% in all the white council members' districts and he maintained black majorities no lower than 75% in all the black council members' districts, except district 3. In each district, except district 3, the majority race was increased as much as possible or if the district was already overwhelmingly of one race, the level was maintained. With district 3, however, the black majority was still reduced substantially, from 84.2% to 68%, that is by 16.2 percentage points.

■ While the above evidence raised a strong suspicion that Folmar purposefully sought to dilute the voting strength of the black electorate in district 3, the following evidence confirmed the suspicion as true. In drafting his original plan Folmar was under the impression that a 55% black district could withstand any court challenge. Inspired by an admitted desire to bring about the defeat of Reed, the black council member from district 3, Folmar purposefully reduced district 3's black majority by 22.7 percentage points, from 84.2% to 61.5%. However, when he was informed that 65% not 55% was the magic percentage number, he allowed another council member to modify his plan by increasing district 3's majority black population to 68%. Folmar's clear purpose throughout the redistricting proc-

ess was therefore to decrease district 3's majority black population to the lowest level he understood to be legally possible in order to reduce the possibility that district 3's council member could be reelected. To the extent his purpose was to dilute the voting strength of district 3's black population, his purpose was impermissible under section 2. Moreover, Folmar secured passage of his modified plan. At his behest, the five members of the city council whom he referred to as his allies adopted his modified plan and enacted it as City Ordinance No. 47–81. City Ordinance 47–81 was therefore in substantial measure the product of a scheme purposefully designed and executed to decrease the voting strength of the black electorate in district 3.

The proffered explanations and justifications of the defendants do not warrant a different conclusion. First of all, the defendants maintain that Folmar's motivation was political not racial. They argue that district 3's racial composition resulted from political animosity between Folmar and Reed. To the extent Folmar's goal was political, and to the extent that he acted out of a desire to reduce the possibility of district 3's council member being reelected, the court recognizes and appreciates that such a political goal may not be a violation of section 2. However, the legality of such a goal is simply not the issue before the court. This court is totally indifferent to the political future of any of the city's political figures. Rather, Folmar went afoul of section 2 when he sought to achieve his goal by purposefully diluting the voting strength of the black electorate in district 3. It is therefore solely the voting rights of the black electorate of district 3, and by extension the voting rights of the black electorate of the city, which are now the court's concern under section 2; and it is solely those rights which the court finds were violated by the enactment of City Ordinance No. 47–81, the city's redistricting plan.[23]

---

**23.** The defendants have not contended that Folmar's modified plan would have emerged as the accepted plan even in the absence of Folmar's scheme of purposeful discrimination. *See, e.g., Lee v. Russell County Board of Education,* 684 F.2d 769, 773–74 (11th Cir.1982). However, if they had advanced this contention they would not have faired any better. The evidence reflects that in the absence of Folmar's scheme to dilute the voting strength of district 3, Folmar would have applied across-the-board the rule of maximizing the racial majorities in each district and would have drafted such a plan.

The defendants also contend that the retrogression in black population in district 3 was necessitated by the requirements of one-person one-vote. They note that there had been population shifts among the districts and that there was a need to increase the population of each district as a result of annexation. Their contention withers in the face of the evidence. First, the record reflects that between 1970 and 1980 the percentage of black residents in the city, even with an annexation that brought in more white than black residents, grew from approximately 34% to 39%. Furthermore, the evidence was that the predominant goal for the mayor and the council in redistricting the city was to maximize the racial majorities in the council district; and the court cannot overlook the fact that the council had two plans, the Reed and Peak plans, which achieved this goal without violating the principle of one-person one-vote and without violating the annexation agreement requirement that no council member be gerrymandered out of his or her district. But more significantly, the evidence affirmatively reflects that the motivating factor behind the retrogression was the desire to reduce the black population in the district to just above a level that would withstand court challenge.

■ The defendants also strongly advance the argument that a 65% or above black district can "safely" select a black representative. Even if this argument had merit—a factual issue which this court does not address—it would not detract from the conclusion that the dilution of the black vote in district 3 was substantial,[24] was done purposefully, and therefore was impermissible under section 2. That is, even though a redistricting plan may accurately

reflect the voting strength of a minority group, it is still invalid if it was adopted for a racially discriminatory purpose. *See City of Port Arthur v. United States,* —— U.S. ——, ——, 103 S.Ct. 530, 535, 74 L.Ed.2d 334 (1982) ("even if the 4–2–3 electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid if adopted for racially discriminatory purposes.")

■ The defendants also place significance on the fact that Luther Oliver, a black council member, voted in favor of City Ordinance No. 47–81. This argument also fails. The use of a black person in effecting a purposefully discriminatory redistricting plan is insufficient by itself to save the plan from censure under section 2. As the former Fifth Circuit recently stated in *McWilliams v. Escambia County School Bd.,* 658 F.2d 326 (5th Cir.1981) (Unit B), an employment discrimination case:

> The mere presence of blacks in the selection process is insufficient to rebut a prima facie case of purposeful discrimination, even when blacks comprise a majority of those responsible for the allegedly discriminatory result.

658 F.2d at 333. Moreover, in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), which concerned alleged racial discrimination in the selection of grand juries, the Supreme Court observed that:

> Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.

---

**24.** Any contention by the defendants that the 16.2 percentage drop in district 3 under the ordinance is insignificant or insubstantial would be simply disingenuous, in view of the overwhelming evidence that the defendant council members and the mayor sought to maximize the racial majorities in the defendant council members' districts.

Moreover, the evidence reflects that if only the voting age population of district 3 is con-

sidered the district's black population is only 63%; and if the dormitory students at a predominantly black university in the district are discounted the district's voting age population is further reduced to only 60%. In *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1163 (5th Cir.1981), the court noted that voting age population, if available, is desirable evidence for a court faced with a challenge based on dilution of the black vote.

430 U.S. at 499, 97 S.Ct. at 1282.[25]

## IV.

The plaintiffs have advanced, alternatively, that Montgomery City Ordinance No. 47–81 violates section 2 because its implementation, irrespective of its purpose, would result in a denial or abridgement of their right to vote on account of their race. They contend that they have established most of the "circumstantial factors" articulated in *White v. Regester, supra,* and *Zimmer v. McKeithen, supra.* Since the court has concluded that the ordinance was enacted for a racially discriminatory purpose in violation of the section, the court sees no need to consider whether these factors were in fact established and whether, as an aggregate, they substantiate the plaintiffs' alternative basis for relief under section 2.[26]

## V.

In view of the court's conclusion that Montgomery City Ordinance No. 47–81 violates section 2 of the Voting Rights Act of 1965, as amended, the court will enter appropriate declaratory and injunctive relief against enforcement of the ordinance. Furthermore, since devising redistricting plans "is a legislative task which the federal courts should make every effort not to preempt," *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978), the court will afford the City of Montgomery an opportunity to fashion, enact, and submit to the court a new redistricting plan free of the discriminatory purpose or result proscribed by section 2. Of course, before any new plan is submitted to the court by the defendants, it must be precleared pursuant to section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c.

**25.** The defendants also place significance on the fact that Oliver voted in favor of the ordinance, Folmar's modified plan, because the other plans placed a "no growth" area in his district. This argument also fails. First of all, this "no growth" reason explains only Oliver's vote. But more importantly the reason, which is extremely subjective, simply cannot stand up against the overwhelming objective evidence that, in practice and theory, the predominant goal for any redistricting plan for the council was that the racial majority in council member's district be as large as possible. District 3 was the only one for which this goal was not achieved. The credibility of Oliver's reason is further undermined by the fact that Oliver and Reed were also staunch political enemies.

**26.** *See* note 20, *supra.* Many of these factors were, however, considered by the court in reaching its conclusion of purposeful discrimination.